1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  FOUZIA ZARGI,                          No. CIV S-08-1677-CMK

12              Plaintiff,

13        vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

14  COMMISSIONER OF SOCIAL
    SECURITY,

15              Defendant.

16  _____/

17

18            Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20  Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21  judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22  before the court are plaintiff's motion for summary judgment (Doc. 12) and defendant's cross-

23  motion for summary judgment (Docs. 15 and 16).

24  / / /

25  / / /

26  / / /

                                           1

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on March 31, 2005. In the application, plaintiff claims that disability began on December 1, 2004. Plaintiff claims that disability is caused by a combination of mental illness and lack of sleep. Plaintiff's claim was initially denied. Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on November 14, 2007, before Administrative Law Judge ("ALJ") Alan K. Goldhammer. In a January 24, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has never engaged in substantial gainful activity;

2. The claimant's symptom allegations are not credible or reliable; she appears to be malingering;

3. The evidence in this case favorable to the claimant must be disregarded on the basis that fraud was involved in providing the evidence; and

4. The claimant has failed to meet her burden of showing that she suffers from a severe medically determinable impairment.

After the Appeals Council declined review on May 29, 2008, this appeal followed.

# II. SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

April 4, 2005 – Roya Sakhai, MFT, completed a form entitled "Request for Extended Service Review." (CAR 108-11). Ms. Sakhai provided the following history:

> Client came to the USA six months ago from Pakistan. In 1998, Taliban came and took her husband and when he came back, all his teeth were gone and had lost weight. She then got psychotic breakdown and started hearing voices and seeing Taliban all the time. Her husband has been her support since he came out of jail. The symptoms of schizophrenia has been present since 1998. Client constantly experiences delusions and auditory hallucinations. . . .

///

April 18, 2005 – The CAR contains a psychological evaluation by Ms. Sakhai. (CAR 104-07). Ms. Sakhai stated that plaintiff is "totally out of touch from reality." Ms. Sakhai added: "In her mind she is still living in Mazare Sharif in Afghanistan." Ms. Sakhai stated that plaintiff suffers from paranoid schizophrenia. According to Ms. Sakhai, plaintiff fears that the Taliban will "walk in the door and torture her. . . ." As to current mental status, Ms. Sakhai stated:

> The patient needs psych evaluation and medication to decrease psychotic symptoms immediately.
>
> In our sessions, I am not sure if she knows where she is or who I am. She keeps talking about the Taliban and worrying about the safety of her sons who are still in Pakistan. She is not in touch with reality so at this time I have been trying to help her with talk therapy, but she needs to take meds for us to continue her treatment with more success.
>
> She comes in starts with her paranoia, after I comfort her she says "are you sure we are not in Mazare Sharif? Are you sure that Taliban will not walk to the door?" I then have to do a long lecture and show her my office and it takes a long time before she believes that we are in the USA. Then she cries and then she tells me about her auditory hallucinations. "They are telling me do not sleep, if you stay awake your sons will be safe."

As to plaintiff's level of functioning, Ms. Sakhai stated:

> The patient requires prompting to tend to her personal hygiene. She is incontinent. All of her personal affairs are handled by her husband (such as making her appointments, filling out paperwork, etc.). All household chores are also performed by her husband or daughter. The patient's symptoms increased since 1998.

Ms. Sakhai added that plaintiff is unable to maintain concentration for even short periods of time and that she is "mostly sleepy and dizzy with psychotic symptoms."

April 22, 2005 – An initial assessment was completed by Kirsi Saxena, M.D., of Pathways to Wellness Mental Health Services. (CAR 202-07). Dr. Saxena noted the following history:

> Fouzia's depression started in 1998 when her husband was arrested in Afghanistan by the mujahedeen. He was jailed for two months. She witnessed him being hit by the mujahedeen. In 1998, she went into shock after this statement. She would faint whenever she saw anybody with a long beard. She would scream. The family moved to Pakistan in 1998

3

and Fouzia went into treatment in Pakistan. She was treated for depression and given Valium at that time and she did improve over several months to the point where the depression improved and she was more interactive and engaged with other people. . . .

As to her level of functioning, the doctor noted:

. . . Since coming to the United States, Fouzia has been depressed. She constantly talks about her children. She misses her children. She will not engage or interact with anybody. Her children here attempt to keep her engaged and talk with her. Her husband stays by her side at all times and takes her with him wherever he goes. She is not sleeping at all. She says she will sleep when her children come to her. Her appetite is very little. She eats barely enough. She needs help with her grooming and hygiene. She is crying constantly throughout the day. She does not talk about wanting to be dead. She has not attempted suicide. She is worried that her children may be taken by the mujahedeen and she wants them to be with her here. . . .

At the time of this assessment, plaintiff did not report any hallucinations or delusions. The doctor assessed extreme functional limitation, extreme difficulty maintaining concentration, persistence, and pace, and marked episodes of decompensation. Dr. Saxena diagnosed major depressive disorder. Plaintiff was provided medication and advised to return in two weeks.

May 12, 2005 – George David, M.D., submitted a response to an agency request for records with the notation: "Patient unknown to me." (CAR 152-53).

July 15, 2005 – Maria Kerosky, Ph.D., an agency examining psychologist, prepared a report following a psychological evaluation of plaintiff. (CAR 114-16). The doctor noted that plaintiff arrived for the evaluation with her husband, who provided all information. During the entire evaluation, plaintiff sat passively in a chair, rocking mildly. Dr. Kerosky stated that plaintiff's husband's reliability could not be established. As reported by plaintiff's husband, Dr. Kerosky noted the following history:

The claimant reportedly "does not talk. She has anxiety. She is frustrated and depressed. When she sees pictures of her sons, she cries – they are still in Pakistan." The claimant's difficulties reportedly began in 1998, when Taliban beat and arrested her husband. She saw the above, "stopped talking and was crying for two years." She is now reportedly "afraid of people with beards."

The doctor also noted that plaintiff was born in Afghanistan and moved to the United States sometime in 2004. Plaintiff worked as a math teacher in Afghanistan. Based on plaintiff's reported history and symptoms, Dr. Kerosky concluded that plaintiff could not perform work duties.

July 22, 2005 – An agency consultative doctor completed a Psychiatric Review Technique Form with discussion of evidence. (CAR 156-71). The doctor opined that plaintiff's condition – major depressive disorder – satisfied the Listings of Impairments. The doctor stated that plaintiff's main disturbance is anxiety evidenced by "[r]ecurrent and intrusive recollections of a traumatic experience. . . ." The doctor stated that plaintiff was markedly limited in activities of daily living, ability to maintain social functioning, concentration, persistence, and pace. The doctor concluded that plaintiff could not perform work duties.

September 23, 2005 – The Cooperative Disability Investigations ("CDI") Unit of the Office of the Inspector General prepared an investigation report. (CAR 79-88). The investigation was initiated after CDI learned that two of plaintiff's treating sources were Roya Sakhai and George David. The investigating agents stated:

> CDI has investigated several claimants who were patients of Dr. David. Each patient had the same symptoms and each was diagnosed with "PTSD." Roya Sakhai, MFT, has been found to also identify herself as a "Ph.D," when in fact, she is not licensed as a psychologist. In this particular case, Roya Sakhai began treating the Subject [plaintiff] in March 2005, according to an April 18, 2005, psychological evaluation. It should be noted that on the April 2005 psychological evaluation, Ms. Sakhai refers to herself as "Ph.D., MFT." Ms. Sakhai indicated that the Subject "goes to George David, M.D., in Fremont" for her psychiatric mediation. Yet, Dr. David returned the May 12, 2005, DDS request for medical records and stated "patient unknown to me." Thus, a case was opened for an investigation due to the Subject's involvement with treating sources Roya Sakhai and George David, M.D.

As with Dr. Kerosky, plaintiff did not speak with CDI investigators, who had their questions answered by plaintiff's husband. The report noted the following:

> On September 9, 2005, at approximately 10:32 AM, the investigator interviewed the Subject at her residence. It took an inordinate amount of time for the Subject's husband to answer the door. When he answered he

appeared to remember the investigators from the previous attempt to
interview his wife. He was advised of the purpose of the visit and he
invited the investigators into his home. He went to the back room to get
his wife to come out and speak with the investigators.

The Subject had to be held by the arm as she made her way to the couch.
As soon as she got to the couch, she leaned over and fell asleep. Her
husband, Habib, said this was normal activity for his wife. An SSA-
provided translator . . . was contacted to assist with the interview. They
were admonished of their reporting responsibilities and were shown
investigator credentials. The questions were directed to Habib since
Fouzia would not wake up or attempt to speak with the investigators. He
provided the following information.

The Subject has a total of eight children. Five live with them in the
apartment and three reside in Pakistan. The Subject came to the U.S.
approximately 1 year ago. At the time she entered the U.S. she did not
have any mental or physical problems. Just prior to leaving Pakistan, she
was working as a 5th and 6th grade teacher. Her disabilities started
approximately five months prior to the date of this report.

Plaintiff's husband also told investigators that plaintiff did not report any mental or physical

disabilities to the INS when she entered the United States in 2004 and he showed investigators

plaintiff's employment authorization card issued by the Department of Justice. He also told the

investigators that he and plaintiff attend weekly four-hour community meetings. When

investigators called plaintiff's house on September 23, 2005, the person answering the phone

identified herself as Fouzia Zargi. The report noted:

Note: The Subject answered the telephone with a clear, steady voice and
communicated with the translator without apparent difficulty. The
conversation was drastically different than when the CDI investigators
attempted to interview her at her residence on September 9, 2005. During
that interview, the Subject would not acknowledge the investigators or
converse with the SSA translator at any time.

The report further noted various inconsistencies regarding plaintiff's mental health condition:

The Subject's husband informed Dr. Kerosky that the Subject's difficulties
reportedly began in . . . 1998, when the Taliban beat and arrested him. She
witnessed this event, stopped "talking and cried for two years."
Nevertheless, it appears the Subject was able to function properly after the
event in 1998 because her spouse informed CDI investigators that she was
working as a 5th and 6th grade teacher when she left Pakistan. The
Function Report – Adult indicated that the Subject "never worked after

6

illness." This appears to be a false statement, since it was reported by her spouse that the Subject was, in fact, a teacher after the 1998 event occurred. Additionally, the Subject's spouse informed CDI investigators that she "did not have any mental or physical problems" at the time that she entered the United States just one year ago. It seems highly unlikely that the Subject would not have any physical or mental problems one year ago and yet, exhibit such severe psychiatric behavior during a current interview with CDI investigators.

October 21, 2005 – Another agency consultative doctor submitted an assessment of plaintiff's medical records. (CAR 177-79). The doctor concluded that the evidence was insufficient to establish any medically determinable impairment. The doctor specifically noted the CDI investigation report and stated as follows in the summary section of the assessment:

. . . Case was closed 7/05 allowance for meeting listing 12.06A5. Claim was recalled for investigation. The investigation report showed many inconsistencies that questions the claimant's credibility. Claimant was completely comatose at the CE exam but on other occasions she was able to speak with interviewers. A recent onset of the illness being 5 months prior does not support the severity of the claimant's condition. . . . Credibility issues do not support the ruling of meets listing. Suggest I.E. as inconsistencies cannot be resolved. . . .

January 20, 2006 – Treatment notes from Pathways to Wellness reveal that plaintiff had no complaints and was not "dissociated anymore." (CAR 199-201). On mental status examination, plaintiff was noted to be calm. Her thought processes were within normal limits, as were her orientation, concentration, memory, knowledge, insight, and judgment.

March 16, 2006 – Treatment notes from Pathways to Wellness indicate that plaintiff's condition was improved with medication but that she "still has flashbacks and nightmares." (CAR 197-98). On mental status examination, plaintiff was noted to be cooperative and calm. Her speech rate was normal and her affect was labile. Plaintiff did not report any hallucinations or delusions.

/ / /

/ / /

/ / /

May 9, 2006 – Michael Zizmor, M.D., prepared a report following a comprehensive psychiatric evaluation. (CAR 192-94). Plaintiff was brought to the evaluation by her husband and spoke with the aid of an interpreter. Dr. Zizmor reported that plaintiff was born in Afghanistan and had 16 years of education. Plaintiff was a school teacher from 1991 to 1998 when the Taliban came to power in Afghanistan and women could no longer work. Plaintiff moved to Pakistan in 1999 and then to the United States in 2004. On mental status examination, Dr. Zizmor noted that plaintiff's speech was "rapid and urgent and linear." As to thought content, the doctor stated:

> [A]s noted, no delusions. She may suffer occasional auditory hallucinations. She suffers flashbacks and recurrent memories of the past. She suffers generalizations of her trauma vis-a-vis men with beards who represent the Taliban. There is a sense of hypervigilence and fears regarding her three children who remain in the Afghanistan-Pakistan area. The claimant denies suicidal ideation, homicidal ideation, and delusions.

Dr. Zizmor diagnosed post-traumatic stress disorder ("PTSD") and major depressive disorder without psychotic features. The doctor provided the following discussion of plaintiff's functional capacity:

> At this time, the claimant would have difficulty understanding, remembering, and carrying out short and simple instructions based on the fact that she is disoriented and has poor short-term memory notes on the mental status examination. She also has difficulties completing a simple 3-step command. Because of her depression and PTSD symptomology and the fact that she is generally socially withdrawn, she would have marked difficulties interacting appropriately with coworkers, supervisors, and the public. The claimant would have marked difficulties dealing with work-related issues such as attendance and safety because of depression and PTSD symptomology. The claimant would have marked difficulties with concentration, persistence, and pace at work. She has poor attention and concentration and poor memory probably secondary to severe chronic stress. The claimant would have moderate to marked difficulties adjusting to changes in the work place. The claimant cannot manage her own funds at this time because of acculturation difficulties, concentration and attention problems, and motivation difficulties brought on by major depressive disorder and PTSD.

/ / /

/ / /

April 20, 2007 – Treatment notes from Pathways to Wellness reveal that plaintiff's son reported that plaintiff is okay sometimes, and other times she cries for 30 to 40 minutes at a time. (CAR 212-13). Plaintiff's son also reported that plaintiff is forgetful. On mental status examination, plaintiff was cooperative and calm. Her mood was depressed. Plaintiff reported no hallucinations or delusions. Her thought processes were linear, but her memory was poor.

June 27, 2007 – Treatment notes from Pathways to Wellness reveal that plaintiff had stopped talking and was detached. (CAR 210-11). On mental status examination, the doctor noted that her behavior was inattentive and her affect was flat.

July 17, 2007 – Ms. Sakhai submitted a second assessment. (CAR 221-25). She offered the following general background:

> [Ms. Zargi] continues her weekly treatment in our center. The main goal of our treatment is to maintain her symptoms, help her communicate with her voices and turn them to positive voices, and keep her on her medication and prevent hospitalization. She needs a ride from family members. She experiences auditory hallucinations which makes it dangerous for her to be alone. She has commanding voices that she needs to control and ask family members to comfort her so she will not listen to the voices and harm herself. The visual hallucinations continue to be Taliban with their long beards and ugly faces. The voices are Taliban voices that are going to harm her husband and family. The progress is very slow. The medication has reduced the voices and images but they continue to persist.

Ms. Sakhai diagnosed schizophrenia and PTSD and stated that these are conditions "dating back to the time of Taliban." As to plaintiff's current mental status, Ms. Sakhai stated:

> Fouzia is in her world. She comes out of it rarely and then goes back. [¶] Our main work is to help her manage her limited activities and to bring her to reality as much as possible by medication management and by reality testing and teaching her to talk to her voices and check the reality of visual hallucination by asking her husband to see if he sees them or not.

Ms. Sakhai added that plaintiff is not oriented and has very bad memory. She stated that plaintiff is "limited in all activities that need orientation to reality."

///

9

July 25, 2007 – Treatment notes from Pathways to Wellness indicate that plaintiff was doing "good" with medication. (CAR 231-32). Plaintiff's son reported that plaintiff had hallucinations. The doctor could not elicit any delusions.

August 23, 2007 – Treatment notes from Pathways to Wellness indicate that plaintiff was doing "a little better" with medication. (CAR 229-30). She was still not talking.

September 20, 2007 – Treatment notes from Pathways to Wellness indicate that plaintiff was doing better with medication, although she still was not talking. (CAR 227-28). On mental status examination, her behavior was calm, her mood was depressed, and her affect was constricted.

November 14, 2007 – With the assistance of a translator, plaintiff testified at the administrative hearing. (CAR 235-57). She stated that her mental health problems began when the Taliban arrested and tortured her husband in 1998. Plaintiff testified that she did not know how old her youngest child was. When asked how many children she has, the ALJ noted: "The claimant's doing an elaborate counting on her fingers. . . ." She stated that she was a 5th and 6th grade teacher during her last two years in Pakistan. She stated that her mental health deteriorated upon coming to the United States because three of her children remained in Pakistan. Plaintiff testified that her condition was improved with medications. As to daily activities, plaintiff testified that she does not leave the house, do chores, or cook. She also stated that she takes her medications and then goes to sleep. Her husband will wake her up later in the day for dinner, after which she will fall asleep again. When asked if all she does is sleep, plaintiff responded: "Yeah, I don't do much."

Charles Agler, M.D., a medical expert, also testified at the administrative hearing. The following exchange took place between the ALJ and Dr. Agler:

> Q:     I guess the major question we have is whether you feel that there's valid, sufficiently valid evidence to draw conclusions from?

/ / /

10

A:     I, I think this whole thing is very questionable.  I felt that with the first set of records because there were conflicting reports like she just was so depressed she couldn't do anything and yet she supposedly was enrolled in an English class.  And there was discrepancy in the history that she never worked but then she was teaching for a while and so forth and so on.  Then that's on the part of she and her family.

Then on the part of the treating team she has a diagnosis of PTSD and she's described as if she were a profoundly depressed person, a vegetative depression with psychosis.  And PTSD usually, not necessarily, but usually people with PTSD retain good cognitive ability.  It's just that they have these terrible flashbacks and they'd be preoccupied with their memories, but at least for short period of time they can be very clear and focused.  They may not be completely able to sustain that all day long, but she's described as being just completely in another world.

Then I have this investigation that was sent to me which caused further question on the whole thing.  Let's see, which one was that?  That would've been 14.  And it turns out, oh well, so the PTSD, and I was wondering if she is showing such severe symptoms, why a diagnosis of PTSD?  And if she's psychotic why isn't she getting an antipsychotic?  So for two years she was treated with just an antidepressant, no antipsychotic, until this year in July suddenly she's put on Abilify.  Then it turns out that Dr. David diagnoses everybody with PTSD and that also the investigation calls into question Roya Sakhai, who claims to by a psychologist at times when she's an MFT.

And the other thing, I thought after the, part of the investigative material that I got today I thought, well, maybe, maybe she really is terribly sick because Dr. Sakhai on the first contact says there wasn't much wrong with her but then later on is saying that she is psychotic, is giving a diagnosis of schizophrenia.  Then I also noticed the prescribing doctor finaly added major depressive disorder on one occasion in '05 and again more recently.  But in spite of that there was no antipsychotic until recently.

It all sounds very strange.  Then the other thing is, well, if she had a major depressive disorder and responded well to medication, then that's fine, but everything I've got is that she only got a, a little bit better and showed some preliminary improvement.

But what you observed, and I heard in Court today, her answers are rapid and crisp.  Sometimes her answers are to the point and very clear, by the interpreter.  Other times she claims she can't remember.  So there's something kind of peculiar about what she can't remember.

She seems to remember a great deal of things with no trouble and other things she can't remember.  You have noted some of the things seem a little suspect.  Those [are] not the kind of thing that a mother would forget.  So I'm not sure what we've got here.  I, there's reason to question the testimony of, of the family and the applicant.  There's certainly a lot of question about the treating team.

Q:     In, in short I take it you don't feel that the evidence is sufficiently reliable to draw conclusions from?

A:     That's correct.

11

Dr. Agler concluded by stating that plaintiff ". . . should have an independent psychological evaluation, preferably by someone who speaks her language. . . ."

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

/ / /

/ / /

/ / /

/ / /

## IV.  DISCUSSION

Plaintiff summarizes her argument as follows:

> Medical evidence shows that Ms. Zargi has severe mental impairments.  The ALJ improperly relied on lay observations and non-examining physician opinion to find otherwise.  To the extent that the evidence was ambiguous, the ALJ should have further developed the record.  Failure to do so was legal error.

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient.  See id.

In this case, the ALJ concluded that plaintiff was not disabled because she did not have a medically determinable impairment which can be considered severe.  The ALJ based this conclusion on the following:

> 1.  Dr. Agler's opinion that there is a lack of reliable medical evidence to establish the existence of a severe mental impairment;
>
> 2.  Inconsistency between plaintiff's inability to recall the details of the 1998 trauma and a diagnosis of PTSD;

/ / /

13

3.      The lack of antipsychotic medication despite a long-standing diagnosis by treating sources of psychosis;

4.      Plaintiff's ability to function at the level necessary to teach 5th and 6th grade in Pakistan even after the 1998 trauma which triggered her alleged mental illness;

5.      Inconsistency between the treating sources' descriptions of plaintiff's mood and affect and her appearance and demeanor at the hearing;

6.      Inconsistency between plaintiff's testimony that she did not know her age or that of her youngest child and plaintiff's training and experience as a teacher;

7.      Inconsistency between Ms. Sakhai's reports and those of the other treating sources, particularly with regards to hallucinations and delusions;

8.      Lack of acute hospitalization, emergency medical visits, or even regular medical visits consistent with a severe mental illness which is not improving; and

9.      Plaintiff's overall lack of credibility.

Plaintiff argues that the ALJ may only find at step two of the sequential evaluation that there is no medically determinable severe impairment when such a finding is clearly supported by the medical evidence.   She concludes that the ALJ erred by relying on his own observations because such observations do not constitute medical evidence.  She also concludes that the ALJ erred in rejecting the diagnoses of treating and examining sources based on the opinions of the agency consultative doctors and Dr. Agler because the opinion of a non-examining source is insufficient to reject a treating and/or examining source.  Though not discussed by the parties, the court will also address the ALJ's credibility finding given that it was a central basis for his decision.

A.      **Evaluation of the Medical Evidence**

Plaintiff contends that the ALJ erred in rejecting the opinions of her treating sources, primarily the doctors at Pathways to Wellness and examining psychiatrist Dr. Zizmor, based on the opinions of non-examining doctors.  Initially, the court notes that this argument is somewhat imprecise.  Specifically, as discussed below, the ALJ did not reject any treating or examining source based on the opinions of a non-examining source.  The record reflects that, of

14

the two non-examining agency consultative doctors who submitted reports, one concluded that plaintiff has a disabling severe mental impairment and the other concluded that the evidence was insufficient and recommended an independent evaluation.  As with the second consultative doctor, Dr. Agler – also a non-examining source – recommended an independent evaluation due to "insufficiently reliable evidence."  Thus, no non-examining source actually rendered an opinion which was inconsistent with an examining or treating source.

Despite plaintiff's imprecision in presenting her argument, the court will review the ALJ's evaluation of the various treating and examining sources.  The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

15

the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

        In this case, the CAR contains medical opinion evidence from the following treating and examining sources: (1) Ms. Sakhai; (2) doctors at Pathways to Wellness, including Dr. Saxena; and (3) Drs. Kerosky and Zizmor.

        1.    Ms. Sakhai

        As to Ms. Sakhai, the ALJ stated:

> The CDI investigation report deals with the report[] by . . . Roya Sakhai, MFT, who is not a licensed psychologist although she seems to be trying to pass herself off as one.  (footnote omitted).  Ms. Sakhai's reports . . . are grossly inconsistent with the other information of record.  She reports a variety of symptoms such as auditory and visual hallucinations, that are unverified and inconsistent with the prescribed medications. . . .

The ALJ noted that, pursuant to 20 C.F.R. § 416.913, a marriage and family therapist ("MFT") is not an acceptable medical source for purposes of determining whether an impairment exists.  The court must agree and, for this reason, concludes that the ALJ did not err in not considering any opinions expressed by Ms. Sakhai.  Moreover, Ms. Sakhai's observations are inconsistent with evidence from valid medical sources.  For example, in April 2005, Ms. Sakhai stated that plaintiff was experiencing delusions and hallucinations.  However, that same month, Dr. Saxena at Pathways to Wellness reported no delusions or hallucinations.  Similarly, in April 2007, plaintiff reported to doctors at Pathways to Wellness that she was not experiencing hallucinations, but Ms. Sakhai stated in July 2007 that plaintiff required "reality testing and teaching her to talk to her voices and check the reality of visual hallucination. . . ."  Later that

month, plaintiff told doctors at Pathways to Wellness that she was doing well with prescribed medications. For these reasons, the court finds that the ALJ did not err in rejecting any opinions expressed by Ms. Sakhai.

2.    Pathways to Wellness

As to the doctors at Pathways to Wellness, including Dr. Saxena who performed an initial evaluation in April 2005, the ALJ stated:

> I believe that the Pathways to Wellness doctors are operating in good faith. However, the Claimant has only seen them occasionally, and apparently they have not questioned the statements she had made to them. She did not see them at all until well after she had filed her disability (SSI) benefit application. I find the Pathways to Wellness records insufficient to show a severe, medically determinable mental impairment or combination of impairments meeting the 12-month duration requirement.

In essence, the ALJ discounted this medical source because plaintiff's treatment was sporadic and any opinions are based on plaintiff's subjective complaints and not objective clinical data. These are appropriate reasons. They are also supported by the record. As to plaintiff's history of treatment with this source, the record reveals that she first sought treatment in April 2005 and then not again until January 2006. Plaintiff sought treatment at Pathways to Wellness only once again in 2006 (March). During 2007, plaintiff was seen at Pathways to Wellness only five times (in April, June, July, August, and September).

Further, the treatment notes generally reflect a non-severe mental impairment which was improved with medication. In January 2006, plaintiff reported no complaints and that she was not "dissociated anymore." On mental status examination, plaintiffs' thought processes were observed to be within normal limits, as were her orientation, concentration, memory, knowledge, insight, and judgment. In March 2006, plaintiff stated that her condition was improved with medication, though she still had "flashbacks and nightmares" from time to time. On mental status examination, her speech rate was normal, plaintiff was cooperative and calm, and her affect was labile. Plaintiff did not report any hallucinations or delusions. On mental status examination in April 2007, plaintiff was cooperative and calm, though her mood was

depressed.  Plaintiff's thought processes were linear.  Again, she reported no hallucinations or delusions.  In June 2007 plaintiff's affect was flat.  In July 2007 plaintiff reported she was doing "good" with medication and the doctor could not elicit any delusions.  In August and September 2007 plaintiff stated she was doing "a little better" with medication.  In sum, while these records may indicate some kind of mental impairment, they do not reflect treatment for any impairment which can be considered severe.

     3. <u>Drs. Kerosky and Zizmor</u>

    Plaintiff was also seen by Drs. Kerosky and Zizmor.  As to these doctors, the ALJ stated:

> The reports by Dr. Kerosky and Dr. Zizmor were based on the impression that the Claimant was credible, but I agree with the CDI report, the State Agency (DDS) medical consultant, and Dr. Agler that there are too many inconsistencies that call into question the Claimant's credibility and, in particular, the supposed recent onset of her illness.  Considering the alleged severity of the mental illness as observed by Dr. Kerosky (the Claimant just sits and rocks and does not speak), it is inconsistent that there have been no acute hospitalizations or even urgent medical visits.

Essentially, the ALJ rejected the conclusions of Drs. Kerosky and Zizmor because they were based solely on plaintiff's subjective complaints and because they were inconsistent with plaintiff's sporadic and conservative course of treatment.  Again, the court finds that these are appropriate reasons supported by the record.  Dr. Kerosky saw plaintiff in July 2005 and, based solely on a history provided through plaintiff's husband, concluded that plaintiff could not perform any work duties at all.  Dr. Kerosky noted that the reliability of plaintiff's husband could not be ascertained.   There is no indication that Dr. Kerosky performed any mental status examination.  Further, as noted by the ALJ, the record reflects only conservative and sporadic treatment, which is inconsistent with the level of impairment alleged by plaintiff and opined by Dr. Kerosky.

/ / /

/ / /

Dr. Zizmor performed a comprehensive psychiatric evaluation in May 2006. The doctor noted that plaintiff's speech was "rapid and urgent and linear." As to plaintiff's thought processes, Dr. Zizmor stated that plaintiff may suffer occasional auditory hallucinations and that she suffers flashbacks and "recurrent memories of the past." The doctor also stated that plaintiff "suffers generalizations of her trauma vis-a-vis men with beards who represent the Taliban." He added: "There is a sense of hypervigilence and fears regarding her three children who remain in the Afghanistan-Pakistan area." Dr. Zizmor diagnosed PTSD and major depressive disorder. He concluded that plaintiff has limitations inconsistent with the ability to perform work. Specifically, he stated that "the claimant would have difficulties understanding, remembering, and carrying out short and simple instructions based on the fact that she is disoriented and has poor short-term memory noted on mental status examination." However, as with Dr. Kerosky's assessment, Dr. Zizmor's assessment of a totally debilitating severe mental impairment is inconsistent with plaintiff's course of treatment.

### B. Plaintiff's Credibility

The ALJ, the agency consultative doctor, and Dr. Agler all concluded that there are numerous inconsistencies in the record and that the evidence is generally unreliable to establish a severe impairment. The ALJ stated: "The reason the medical evidence is not reliable is because these are all based on statements by the Claimant and her behavior which appear contrived." Regarding credibility, the ALJ provided the following specific observations:

> As indicated in the CDI investigation report and as admitted by the Claimant at the hearing, she taught classes in Pakistan for at least two years **after** her husband's beating. Indeed, she lived in Pakistan **for six years** after the supposed beating of her husband and taught school in Pakistan during the last two years. (bold in original).
>
> * * *
>
> Although the Claimant was described as depressed and tearful when interviewed by Dr. Zizmor, . . . she did not appear depressed at the hearing. In fact, quite the contrary, she appeared very animated in her facial expressions and gestures. Her hands were constantly moving as she talked with the interpreter. She spoke rapidly, rather than in a slowed

manner.  She made eye contact.  Perhaps her animation reflects the improvement noted in the Pathways to Wellness records but, curiously, Mrs. Zargi claimed there had been no change and that she still wasn't sleeping well, screamed during the night, and was unable to help with household chores.  Her demeanor was quite inconsistent with severe depression.  My observations are relevant on the issue of credibility. . . .

* * *

Mrs. Zargi also claimed that she didn't know how old she was or when she had been born.  However, she had a teaching credential in Pakistan and taught fifth and sixth grades.  She claimed she didn't know how old her youngest child was, although she knew that the child attended eighth grade. . . .

Plaintiff does not dispute any of the observations outlined above.

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.  Nor must the claimant produce objective medical evidence of the causal relationship between the

medically determinable impairment and the symptom.  By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

The court finds that the ALJ's adverse credibility finding is supported by substantial evidence.  The record demonstrates that plaintiff's statements concerning the severity and duration of her impairment are inconsistent.  In particular, plaintiff testified at the hearing in November 2007 that her mental health problems began just after her husband's beating in 1998.  She reported to Ms. Sakhai in April 2005 that, after the beating, she began experiencing psychotic breakdown and "started hearing voices and seeing Taliban all the time."  Plaintiff told Ms. Sakhai that "[h]er husband has been her support since he came out of jail" and that "schizophrenia has been present since 1998."  Plaintiff's report to Dr. Kerosky in July 2005 was essentially the same.  It was reported to Dr. Kerosky that plaintiff did not talk and that her

problems began in 1998 and were present when she came to the United States. Plaintiff stated in documents submitted with her social security application that she did not work at all after the 1998 incident.

However, as the ALJ observed, plaintiff was able to teach school in Pakistan after she left Afghanistan following her husband's beating in 1998. This directly contradicts her statement that she did not work at all after 1998. Either plaintiff was not as severely traumatized by the 1998 incident as she claims, or, as plaintiff reported to Dr. Saxena in April 2005, she improved after moving to Pakistan where she received treatment and medication. The latter scenario suggests an impairment which, at worst, is treatable with medication. Further, as the CDI report notes, plaintiff did not report any mental or physical problems when she entered this country. This also suggests that either plaintiff was never impaired or that her impairment was under control as a result of the treatment she received in Pakistan. And, despite plaintiff's presentation to Dr. Kerosky in July 2005 and to the CDI investigators upon their initial contact on September 9, 2005, plaintiff's demeanor and behavior was markedly different later in September 2005 when the CDI investigators contacted plaintiff a second time, as well as at the time of the November 2007 hearing. Moreover, as discussed above, the Pathways to Wellness records do not reflect an impairment of the severity claimed by plaintiff. In fact, these records show that plaintiff was responding well to medication. Plaintiff admitted at the November 2007 administrative hearing that her condition was improved with medication.

As to plaintiff's sleep patterns, plaintiff claims that her disability is caused, in part, by an inability to sleep. She told Ms. Sakhai and other health care providers that she hears voices that tell her not to sleep and that as long as she stays awake her children in Pakistan will be safe. However, at the November 2007 administrative hearing, the ALJ asked plaintiff if all she does is sleep and plaintiff responded "Yeah, I don't do much." Either plaintiff was not truthful in her disability application and reports to health care professionals, or she was not truthful at the administrative hearing. In addition, even though plaintiff is educated and worked

as a school teacher in Afghanistan until 1998 and then in Pakistan for two years before entering the United States, the ALJ observed at the hearing that she used elaborate finger counting to tell him how many children she had.  The ALJ also noted that plaintiff did not know the age of her youngest child.  These observations are not consistent with plaintiff's background as a teacher.

Given the inconsistencies and contradictions in plaintiff's various statements, it is simply impossible to know what to believe.  If plaintiff is not manufacturing her illness, the conflicting statements suggest that plaintiff's impairment is improved and well-controlled with medication.  In any event, the court finds that the ALJ provided sufficient reasons, all of which are supported by substantial evidence in the record, for finding that plaintiff is not credible.

### C.    The ALJ's Observations

The ALJ concluded that plaintiff's inability to recall the details of the 1998 trauma is inconsistent with a diagnosis of PTSD.  Specifically, the ALJ stated:

> Although the Claimant dates her alleged impairment from watching her husband being beaten back in 19[9]8, unlike Claimants I have heard with PTSD, she provides no details.  Claimants with PTSD tend to recall in vivid detail the atrocities or horror that they witnessed.

Plaintiff cites Montijo v. Secretary of Health and Human Services, 729 F.2d 599 (9th Cir. 1984), and argues that "[t]he ALJ's lay observations are not medical evidence and are not sufficient to draw medical conclusions."  Montijo, however, is not quite on point.  In Montijo, the Ninth Circuit held that an "administrative law judge's observation of the claimant at the hearing . . . does not provide a sufficient reason to reject the otherwise uncontroverted medical evidence."  Id. at 602.  Here, the ALJ's statement was not based on his observation of plaintiff at the hearing but was based on a perceived inconsistency between plaintiff's stated inability to remember details from 1998 and a diagnosis of PTSD.   This is not a case of uncontroverted medical evidence being rejected by an ALJ's observations at the administrative hearing.

/ / /

/ / /

1    Nonetheless, the court agrees with plaintiff's premise. The ALJ's conclusion that

2    plaintiff's inability to recall the details of the 1998 trauma is inconsistent with PTSD is

3    unsupported by any medical evidence and the ALJ himself is not qualified to render a medical

4    opinion. Specifically, the ALJ's conclusion is premised on the statement that people with PTSD

5    tend to recall the details of their trauma. This statement, however, is based on the ALJ's own

6    personal experience in past cases and is not based on any medical evidence as to the nature of

7    PTSD and the ability of those who suffer from PTSD to recall the details of their trauma. While

8    Dr. Agler testified that PTSD would not ordinarily affect cognitive functioning and that

9    plaintiff's inability to remember in general was inconsistent with such a diagnosis, he did not

10    specifically state that individuals with PTSD typically remember details of their trauma.

11    The court finds, however, that any error is harmless. The Ninth Circuit has

12    applied harmless error analysis in social security cases in a number of contexts. For example, in

13    Stout v. Commissioner of Social Security, 454 F.3d 1050 (9th Cir. 2006), the court stated that the

14    ALJ's failure to consider uncontradicted lay witness testimony could only be considered

15    harmless ". . . if no reasonable ALJ, when fully crediting the testimony, could have reached a

16    different disability determination." Id. at 1056; see also Robbins v. Social Security

17    Administration, 466 F.3d 880, 885 (9th Cir. 2006) (citing Stout, 454 F.3d at 1056). Similarly, in

18    Batson v. Commissioner of Social Security, 359 F.3d 1190 (9th Cir. 2004), the court applied

19    harmless error analysis to the ALJ's failure to properly credit the claimant's testimony.

20    Specifically, the court held:

21            However, in light of all the other reasons given by the ALJ for
               Batson's lack of credibility and his residual functional capacity, and in
22            light of the objective medical evidence on which the ALJ relied there was
               substantial evidence supporting the ALJ's decision. Any error the ALJ
23            may have committed in assuming that Batson was sitting while watching
               television, to the extent that this bore on an assessment of ability to work,
24            was in our view harmless and does not negate the validity of the ALJ's
               ultimate conclusion that Batson's testimony was not credible.

25            Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)).

26

In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the claimant's age and education.

The harmless error standard was recently applied in Carmickle v. Commissioner, 533 F.3d 1155 (9th Cir. 2008), to the ALJ's analysis of a claimant's credibility. Citing Batson, the court stated: "Because we conclude that . . . the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error." See id. at 1162. The court articulated the difference between harmless error standards set forth in Stout and Batson as follows:

> . . . [T]he relevant inquiry [under the Batson standard] is not whether the ALJ would have made a different decision absent any error. . . it is whether the ALJ's decision remains legally valid, despite such error. In Batson, we concluded that the ALJ erred in relying on one of several reasons in support of an adverse credibility determination, but that such error did not affect the ALJ's decision, and therefore was harmless, because the ALJ's remaining reasons *and ultimate credibility determination* were adequately supported by substantial evidence in the record. We never considered what the ALJ would do if directed to reassess credibility on remand – we focused on whether the error impacted the *validity* of the ALJ's decision. Likewise, in Stout, after surveying our precedent applying harmless error on social security cases, we concluded that "in each case, the ALJ's error . . . was inconsequential to the *ultimate nondisability determination*."
> Our specific holding in Stout does require the court to consider whether the ALJ would have made a different decision, but significantly, in that case the ALJ failed to provide *any reasons* for rejecting the evidence at issue. There was simply nothing in the record for the court to review to determine whether the ALJ's decision was adequately supported.

Carmickle, 533 F.3d at 1162-63 (emphasis in original; citations omitted). Thus, where the ALJ's errs in not providing any reasons supporting a particular determination, the error is only harmless if the ultimate disability conclusion is invalid because a reasonable ALJ would have reached a different conclusion had the error not occurred. Otherwise, an ALJ's error is harmless if it is inconsequential to the ultimate conclusion regarding disability.

///

///

///

In this case, while the ALJ improperly expressed his lay opinion as to plaintiff's PTSD, he provided other valid reasons for concluding that plaintiff failed to establish a severe mental impairment. Specifically, the ALJ cited the lack of medical evidence to establish such an impairment, as well as plaintiff's lack of credibility. The court finds that any error in commenting on the inconsistency between plaintiff's lack of memory and the details of the 1998 trauma and a diagnosis of PTSD is inconsequential to the ultimate decision. Even without the error, the ALJ's determination that the evidence fails to establish a severe impairment is supported by substantial evidence and remains valid.

### D. Duty to Develop the Record

The ALJ has an independent duty to fully and fairly develop the record and assure that the claimant's interests are considered. See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). When the claimant is not represented by counsel, this duty requires the ALJ to be especially diligent in seeking all relevant facts. See id. This requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978). Ambiguous evidence or the ALJ's own finding that the record is inadequate triggers this duty. See Tonapetyan, 242 F.3d at 1150. The ALJ may discharge the duty to develop the record by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow for supplementation of the record. See id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

Plaintiff argues:

> [T]o the extent that the nature of Ms. Zargi's mental impairment is unclear, this is in part due to the ALJ's failure to fully develop the record. As noted, the medical expert testified that in light of certain inconsistencies, Ms. Zargi should undergo an independent psychological evaluation. Such an evaluation is authorized by 20 C.F.R. § 416.917. . . .

Plaintiff asserts that this case should be remanded for an independent psychological evaluation. Defendant responds merely by stating: "Here, the evidence was not ambiguous, nor did the ALJ

determine that the record was inadequate."

In this case, two doctors recommended that plaintiff undergo an independent evaluation. At the hearing, Dr. Agler testified that he did not feel the evidence was sufficiently reliable to draw a conclusion and recommended that plaintiff ". . . should have an independent psychological evaluation, preferably by someone who speaks her language. . . ." Similarly, an agency consultative doctor expressed the need for an independent examination due to the unreliability of the evidence. In July 2005, an agency consultative doctor concluded that plaintiff's major depressive disorder precluded work duties. Based on the record available at the time, the doctor concluded that plaintiff's impairment satisfied the Listings of Impairments. Following the September 2005, CDI report, however, a second agency consultative doctor concluded in October 2005 that, due to "credibility issues," it could not be said that plaintiff had an impairment which satisfied the Listings of Impairments. This second agency consultative doctor recommended an independent evaluation.

As to Dr. Agler, the ALJ stated:

> . . . Charles F. Agler, M.D., a psychiatrist, participated at my request and testified by telephone as a medical expert witness.

> * * *

> Dr. Agler, the medical consultant, testified at the hearing that there is no reliable evidence in this record upon which one could conclude that the Claimant has a medically determinable mental impairment. I agree. . . .

The ALJ did not address Dr. Agler's conclusion that, in light of the unreliability of the evidence, plaintiff should undergo an independent psychological evaluation. Nor did the ALJ address the agency consultative doctor's recommendation for an independent evaluation. Plaintiff argues that the ALJ failed to discharge his duty to develop the record by ordering an independent evaluation.

/ / /

/ / /

27

The court does not agree. The duty to develop the record is triggered when the ALJ specifically finds that the evidence is inadequate to make a decision, or when the evidence is ambiguous. In this case, the evidence is neither inadequate nor ambiguous. The ALJ found the evidence to be unreliable, inconsistent, and insufficient to establish a severe impairment. Thus, the evidence was adequate to allow the ALJ to make this decision. Further, the evidence was not ambiguous. Inconsistency is not the same as ambiguity. Inconsistent evidence is that which is not compatible with a particular explanation. In this case, the evidence was not compatible with the level of severity claimed by plaintiff. The evidence was not ambiguous, which means incapable of explanation, because the ALJ was in fact able to explain the inconsistencies as resulting from plaintiff's lack of credibility and apparent malingering. In sum, despite the various recommendations that plaintiff undergo an independent psychological evaluation, the ALJ was never under any duty to further develop the record.

## V. CONCLUSION

As the ALJ observed, plaintiff appears to be malingering. On the one hand, she claims her impairment was caused by the 1998 trauma in Afghanistan and that, immediately after that trauma, she was dependent on her husband for care. However, in her application for benefits, she states that the disability began just after arriving in the United States. Further, she was able to work in Pakistan as a teacher after leaving Afghanistan and before entering the United States. After plaintiff's claim for benefits was filed, an investigation was conducted based on apparent fraud. Specifically, CDI noted that plaintiff had listed a doctor and another individual – Ms. Sakhai – who had been linked with fraudulent social security claims. Upon investigating the case, the CDI investigators observed numerous inconsistencies. These are well documents in the investigation report of September 2005. Interestingly, plaintiff does not challenge the ALJ's finding that favorable evidence had to be rejected because it was obtained through fraud.

1    From all appearances, the severity of plaintiff's mental impairment, if any exists at

2 all, is completely feigned for purposes of qualifying for social security benefits. While the court

3 has no reason to doubt the trauma she and her family experienced in 1998, and while the court

4 sympathizes with the undoubtedly difficult circumstances plaintiff has faced in Afghanistan and

5 Pakistan before coming to this country, it cannot countenance the perpetuation of fraud in order

6 to obtain benefits which are available as a result of contributions from hard-working people.

7    Based on the foregoing, the court concludes that the Commissioner's final

8 decision is based on substantial evidence and proper legal analysis. Accordingly, IT IS HEREBY

9 ORDERED that:

10    1.    Plaintiff's motion for summary judgment (Doc. 12) is denied;

11    2.    Defendant's cross-motion for summary judgment (Docs. 15 and 16) is

12 granted; and

13    3.    The Clerk of the Court is directed to enter judgment and close this file.

14

15 DATED: May 26, 2009

16

17 **CRAIG M. KELLISON**
   UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

29